MARK POE (SB #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (SB #223718)
  rgaw@gawpoe.com
SAMUEL SONG (S.B. #245007)
  ssong@gawpoe.com
VICTOR MENG (S.B. #254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs Donald Breyer,
M.D. and Mark Klepper, M.D.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Donald Breyer, M.D.; Mark Klepper, M.D., <br><br> Plaintiffs, <br><br> vs. <br><br> Ankura Consulting Group, LLC, <br><br> Defendant. | Case No.:  21-cv-2541 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Donald Breyer, M.D. and Mark Klepper, M.D. hereby make the following allegations against defendant Ankura Consulting Group, LLC.

## INTRADISTRICT ASSIGNMENT

1.     Pursuant to Local Rule 3-2(c), this case is properly assigned to the San Francisco or Oakland Division because a substantial part of the events giving rise to this action took place

1

in Sonoma County, and Defendant Ankura Consulting Group, LLC maintains offices in San Francisco.

## NATURE OF THIS ACTION

2.     This action concerns the calculated and coordinated conduct of Defendant Ankura Consulting Group, LLC and nine asbestos trusts to end the legal consulting careers of two renowned physicians, Plaintiffs Donald Breyer, M.D. and Mark Klepper, M.D.  The main purposes of Defendant's conduct was to deprive thousands of asbestos-related injured workers -- diagnosed by Drs. Breyer and Klepper -- of their rightful claims to compensation from billions of dollars available in asbestos trust funds.  On information and belief, and as Drs. Breyer and Klepper expect to confirm through discovery in this action, Ankura's conduct was coordinated by the principals of prominent plaintiff-side asbestos law firms, for the purpose of protecting what they see as "their" shares of the billions of dollars held by the trusts, yet to be distributed. These same principals of prominent plaintiff-side asbestos law firms serve as fiduciaries of the nine asbestos trusts which banned the Plaintiffs' expert reports.

3.     Dr. Breyer became a board-certified radiologist in 1978, and Dr. Klepper has practiced in pulmonary medicine since 1986.  Dr. Breyer is among just 13 doctors in California who are currently certified by the National Institute for Occupational Safety and Health ("NIOSH") as "B-Readers" of chest x-rays, *i.e.*, physicians who have demonstrated proficiency in classifying radiographs of dust-related illnesses in human lungs.  For his part, Dr. Klepper is among just 12 qualified B-Readers in Texas.  B-Readers must demonstrate their proficiency in this practice by re-testing at least every four years.  Dr. Breyer first became qualified as a B-Reader in 1990, and has demonstrated his skill and proficiency at diagnosing dust-related medical conditions at four-year intervals ever since, passing the NIOSH re-certification exam seven times.  Dr. Klepper obtained his B-Reader qualification in 1993, and has been re-certified in 2009, 2013, and 2017.

4.     Beginning in the late-90s, Drs. Breyer and Klepper independently began developing practices in reading chest x-rays for workers who were exposed to asbestos in the

workplace, and who desired to learn whether any asbestos-related disease had manifested in their lungs, such that they might be entitled to compensation from the manufacturers of those products.  As part of those practices, Drs. Breyer and Klepper have been retained by at least a dozen law firms to read the radiographs of their actual and potential asbestos disease clients, to determine whether a given client had manifested a compensable injury.  Where doctors such as Plaintiff Doctors Breyer and Klepper diagnosed such an injury, the injured worker would typically submit a claim to one or more of the several trusts that have been created in conjunction with the bankruptcies of asbestos manufacturers, including such well-known names as Celotex, Owens Corning/Fibreboard, U.S. Gypsum, Pittsburgh Corning, and W.R. Grace & Co. (which are among the trusts at issue here, and hold over $5 billion in trust assets).  If the claim is properly processed by the Trust, the injured worker would then receive a settlement amount, depending on the nature of his or her illness and other factors, adjusted by the "payment percentage" then offered by a given trust.

5.     Twenty-seven and twenty-two years into Dr. Breyer's and Dr. Klepper's respective practices of submitting "B-Reads" for injured workers who had asbestosis—a sometimes lethal but non-malignant disease—nine of the asbestos trusts engaged and authorized Defendant Ankura Consulting Group (a consulting firm with whom the trusts have a longstanding consulting relationship) to design and perform an "audit" of 25 of the thousands of radiographic reads that each Dr. Breyer and Dr. Klepper had performed over the years.  As alleged more fully herein, the "audit" was in fact not designed to evaluate the *accuracy* of Dr. Breyer's and Dr. Klepper's reads, but was instead a pretext designed to "fail" the doctors. By failing the doctors through a sham audit, Defendant Ankura consulting could effectively reduce, suppress, and delay tens of thousands of claims that were being submitted to the trusts collectively, by limiting the claims submitted through the law firms that retained the Plaintiffs. By eliminating Dr. Breyer and Dr. Klepper from the pool of qualified diagnosing doctors, and thereby restricting, delaying, and suppressing the number of claims submitted by the many law

Complaint

firms from around the country that retained them, Ankura and the "participating trusts" sought to ensure that the assets of those trusts would be preserved for claims tendered by the same prominent asbestos firm principals who also have seats on the "Trust Advisory Committees" or "Asbestos Claimant's Committees" that run the affairs of the trusts and have a strict fiduciary duty to all claimants (not just those represented by their own firms).  Pursuant to that coordinated plan, in January 2020, Ankura informed Dr. Breyer and Dr. Klepper that they had "failed" the audit, and that the nine trusts on whose behalf Ankura had performed the audit would no longer accept their B-reads in conjunction with claims submitted by injured workers.  Despite multiple requests from the doctors, Ankura has refused to divulge any of the criteria, basis or operations by which the "audits" were conducted, including *who* it was that determined that these preeminent doctors were incapable of reliably and accurately diagnosing asbestos-related disease.

6.      Because the manufacturer asbestos trusts themselves are immune from legal claims by anyone other than the workers they injured, Drs. Breyer and Klepper are unable to pursue an injunction against the nine trusts to have the decision reversed, and thus have their reputations restored.  Accordingly, Plaintiffs bring this action for monetary relief against Ankura, seeking compensation for the past and future business and reputational losses they have suffered and will continue to suffer from the sham audit process that Ankura designed and conducted in coordination with the trusts' and on their behalf.

## PARTIES

7.      Plaintiff Donald Breyer, M.D., is a radiologist and resident of Sonoma County, California.

8.      Plaintiff Mark Klepper, M.D., is a specialist in pulmonary disease and resident of Texas.

9.      Defendant Ankura Consulting Group, LLC is a Delaware limited liability company based in Washington, D.C., with offices in numerous cities worldwide, including in Los Angeles, Irvine, and San Francisco, California.

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action because the amount in controversy exceeds $75,000, and because plaintiff Donald Breyer, M.D. is a citizen and resident of California, and plaintiff Mark Klepper is a citizen and resident of Texas, while the defendant is a Delaware limited liability company based in Washington, D.C., which, upon information and belief does not have any members who are residents of California.  Accordingly, the Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a).

11.     Venue lies in this District because a substantial portion of the events giving rise to this matter took place in Sonoma County, where Dr. Breyer lives and works, and from where Dr. Breyer participated in the "audit" that forms the heart of this action.  28 U.S.C. § 1391(b)(2). Venue lies in this District for Dr. Klepper's claim because defendant Ankura Consulting Group resides in this District.  28 U.S.C. § 1391(b)(1); (c)(2).

## FACTUAL ALLEGATIONS

### A.  Background

12.     Asbestos has been widely used as a construction and insulating material since the mid-19th century.  Evidence of its toxicity to the human lungs accumulated over the ensuing decades, until litigation in the 1970s proved that manufacturers in asbestos-related industries had long known of its dangers, but had concealed that information from the workers that were exposed to the substance, and worked with it every day.

13.     In the face of ensuing waves of mass-tort litigation, dozens of the largest asbestos manufacturers have declared bankruptcy since that time, through which the company typically creates a bankruptcy "trust" that is endowed with substantial capital intended to be distributed to injured workers, as their asbestos-related diseases manifest.  Illustrating the magnitude of these reserves, eight out of the nine trusts with whom Ankura conspired to engage in the conduct described herein each manage over $1 billion in trust assets.

14.     The formation and administration of asbestos trusts was pioneered through the bankruptcy of the Johns-Manville Corporation in 1988.  The creation and administration of

asbestos trusts has become largely systematic, with each trust adopting a similar "schedule" of compensatory payments to injured workers, based on the nature and extent of their manifested disease and exposure to a particular asbestos product. Those schedules of payments to injured workers (the unliquidated value) are subject to a "payment percentage" that can vary over time, depending on the number and rate of claimants, purportedly then adjusted by a given trust's expectations regarding the extent of its future liabilities.  For example, the trust established to compensate workers injured by U.S. Gypsum currently has a payment percentage of just 19.2%, such that where a worker has manifested an injury that would entitle him to $100,000, he is entitled to only $19,200 through filing a successful administrative claim on the U.S. Gypsum trust.

15.     The activities of the asbestos trusts are directed by a number of "trustees."  The actions of those trustees are largely prescribed by the members of a given trust's "Trust Advisory Committee" (often referred to as "TACs"), whose members are—according to a 2017 Forbes article describing an investigation by several state attorneys general—"dominated by plaintiff lawyers from a few prominent firms including New York's Weitz & Luxenberg, and Baron & Budd in Dallas," who "collect[] tens of millions [of] dollars in contingency fees from settlements paid by those trusts."  For example, Oakland asbestos attorney Steven Kazan, Perry Weitz of Weitz & Luxenberg, and Steve Baron of Baron & Budd sit on the Trust Advisory Committees of most or all of the nine trusts at issue here.

16.     Until they were terminated through the conduct described herein, Drs. Breyer and Klepper focused on performing radiographic examinations for clients of competitor law firms, most or all of which were not members of the inner circle of firms who hold membership in the Trust Advisory Committees ("TACs")  and thereby hold the reins of the trusts' activities. Drs. Breyer and Klepper had never been retained by Steven Kazan, Perry Weitz, or Steve Baron for consulting work on asbestos cases.

17.     Despite Justice Department guidance that "disfavors" working for more than one trust, Defendant Ankura has served as a consultant or in some capacity to dozens of asbestos trusts (including the nine trusts who conspired with Ankura to engage in the unlawful conduct described herein) for approximately two decades.  In its consulting role, Ankura has worked with the trusts on everything from performing overarching assessments of the liabilities facing the trusts, to providing claims management consulting services.

**B.  Drs. Breyer and Klepper**

18.     Plaintiff Donald Breyer, M.D. is a 1971 graduate of the University of Illinois College of Medicine, completing his residency in radiology at the Cook County Hospital and Mt. Sinai Hospital.  Dr. Breyer became licensed in California in 1973, and has been a practicing radiologist since 1978.  He is further certified in Diagnostic Radiology by the American Board of Radiology.  Over his lengthy career, Dr. Breyer  was affiliated with the Alameda County Medical Center for over twenty years. During that time he served on many hospital committees and was appointed acting chief of the radiology department. Outside the hospital he served as an officer in the East Bay Radiology Society for several years including a term as president. The East Bay Radiology Society is the premier organization for radiologists and operates under the aegis of the American College of Radiology. Dr. Breyer taught for eighteen years at the University of California San Francisco  (UCSF) where he achieved the rank of full clinical professor.  The University of California San Francisco is among the best medical institutions in the country.

19.     The American College of Radiology elected Dr. Breyer a fellow of the college in 1996 in acknowledgement of his service to the field of radiology. This is an honor accorded to ten to fifteen percent of American radiologists and allows the recipient to add the letters F.A.C.R to his name.  Since 2004 he has served as a consultant and medical expert witness in the field of chest radiology.

20.     Dr. Breyer passed the examination to become a qualified B-Reader in 1990.  Two years later, he started occasionally performing B-reads in conjunction with legal claims by individuals who had been exposed to asbestos in the workplace, and began developing a

substantial practice in that area in 1997.  Over the two decades that followed, Dr. Breyer has

performed tens of thousands of B-reads regarding potential asbestos-related injuries.  He has

continuously passed NIOSH's qualifying exam at regular intervals every four years over that

period.

21.     Dr. Klepper, M.D. is a 1986 graduate of the University of Missouri Kansas City

School of Medicine, completing his residency at Baylor College of Medicine.  Dr. Klepper holds

certifications in Internal Medicine and Pulmonary Disease from the American Board of Internal

Medicine.  Over his career, Dr. Klepper has served on the board of both Seton Medical Center in

Austin, Texas and Providence Medical Center in in Waco.  While in Austin he was a full partner

in the largest pulmonary / critical care group in that city for 14 years, managing those services

across five separate hospitals with 24/7 coverage.  Dr. Klepper's expertise in pulmonary

medicine has allowed him to obtain three medical device patents for airway devices.

22.     Dr. Klepper passed the examination to become a qualified B-Reader in 1993.  He

began performing B-reads to evaluate and diagnose potential claimants respecting asbestos-

related disease in 1997, and over the ensuing years has performed over 10,000 B-reads of such

claimants.

23.     The means by which Drs. Breyer and Klepper made their evaluation was by

reviewing chest x-rays of potential asbestos claimants, comparing those films to a set of

"standard" films adopted by NIOSH as exemplary of various degrees of asbestosis.  Early in

their practices the x-rays were often provided on physical x-ray film.  More recently, physical

films have been supplanted by high-definition digital imagery, which was typically provided to

the doctors by the law firms who engaged them on computerized storage media like CDs.

24.     The standard document by which Drs. Breyer and Klepper render their diagnosis

is a two-page form promulgated by the International Labour Office ("ILO") for systematically

describing and recording radiographic appearances of certain abnormalities (if any are present)

caused by the inhalation of asbestos and other disease-causing dusts.  This document was

designed by the ILO for the purpose of achieving uniformity in evaluating such diseases across readers.  It consists of a series of fields and checkboxes, beginning with a rating of the quality of the film from which the diagnosis is rendered, and continuing through a range of different variables.  The most pertinent variable for diagnosing asbestosis relates to the form's boxes for "Small Opacities," in which the reviewing physician indicates the size and shape of the opacities, the region or regions of the left and/or right lung in which they are seen, and classifies the degree of "profusion" (i.e., the concentration).

25.     Profusion is rated on a scale that has 12 different values, consisting of two numbers separated by a "/."  The first digit is called the "major category," where "0" signifies no asbestosis, and 1, 2, or 3 signifies increasingly advanced concentration of opacities.  The second digit is called the "minor category," and signifies the degree of profusion that the reader would have alternatively found.  Thus, a rating of 1/0 indicates that the reader has identified a "1" level of profusion, where the next closest rating would have been "0."  In the same way, a 1/1 reading indicates that the only reasonable read is a "1" level of profusion, while a 1/2 reading indicates a "1" level, with the recognition that if the reader had not classified it a "1," he or she would have classified it as a "2."  In developing and promulgating this classification system, both ILO and NIOSH expressly recognize the potential for "reader variability" in rendering the profusion reading.

26.     In addition to the standard ILO diagnostic form, Drs. Breyer and Klepper would sometimes (when requested by the counsel who engaged them) prepare short written reports summarizing their findings for a given potential claimant.  Either on the ILO form or in those short written reports, Drs. Breyer and Klepper would often note other potential lung conditions that they thought may be important to apprise the claimant of, such as a note by Dr. Breyer in one of the diagnoses subject to the sham audit, in which he alerted the client's counsel:  "4.0 cm rounded mass in the [left] upper lung zone.  This is highly suspicious for malignancy.  Further evaluation recommended."  Nor did the doctors care only about conditions in the clients' lungs,

and whether asbestosis was present.  Instead they frequently volunteered potentially life-saving information related to other thoracic conditions, such as in a 2016 report subject to the sham audit, in which Dr. Breyer noted:  "Large right paratracheal mass.  Rule out malignancy.  Further evaluation is recommended.  Please refer patient to personal physician."

**C. Dr. Breyer's Experience with Ankura's Sham "Audit"**

27.    Ankura performed a nearly identical sham audit with respect to both Dr. Breyer and Dr. Keppler.

28.    Starting with Dr. Breyer's experience, in April and June 2019, a law firm that represents Defendant Ankura called Keating Muething & Klekamp ("KMK") contacted five law firms for whom Dr. Breyer had performed B-reads for asbestosis claimants.  This contact was initiated on behalf of nine asbestos trusts:  Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust ("AWI Trust"), Celotex Asbestos Settlement Trust ("Celotex Trust"); Babcock & Wilcox Asbestos Personal Injury Trust ("B&W Trust"), Owens Corning/Fibreboard Asbestos Personal Injury Trust ("OC/FB Trust"), Federal Mogul Asbestos Personal Injury Trust ("Federal Mogul Trust"), USG Asbestos Personal Injury Settlement Trust ("USG Trust"), WRG Asbestos PI Trust ("WRG Trust"), Pittsburgh Corning Corporation Asbestos Personal Injury Trust ("PCC Trust"), Flintkote Asbestos Trust ("Flintkote Trust").  Hereafter these trusts are referred to as the "Participating Trusts" or the "Trusts."

29.    KMK's letter informed the firms that during the course of audits of claims filed by those firms, "the Trusts' expert physicians reviewed chest x-rays interpreted" by Dr. Breyer. It stated that while "Dr. Breyer indicated that a number of the x-rays supported a finding of asbestos-related disease, the Trusts' experts determined that some of the x-rays did not support such a finding in compliance with American Thoracic Society standards."  The letter continued: "Before the Trusts reach a final conclusion regarding the acceptability of reports by Dr. Breyer," they intended to have: "representatives of the Audit Team contact Dr. Breyer to: 1) provide him with a sampling of the previous x-rays he reviewed; and 2) discuss his process for reviewing the x-rays. The purpose would be to facilitate a conversation during which Dr. Breyer may attempt

to support his determination of acceptability, which is contrary to the findings of the Trusts'
expert physicians, and to avoid the possibility that the Trusts will no longer accept reports from
Dr. Breyer." The letters stated that across the five firms, Ankura would select "a total sample
size of 25 claimants with both passing and non-passing claims," and asked the firms to give
permission to Ankura to contact Dr. Breyer to proceed with the review.

30.     On July 8, 2019, Dr. Breyer emailed the signatory of four of the letters, KMK
attorney Darcy Watt, to inform her that he had received the letters, accepting Ankura's offer for
him to undertake certain work to "attempt to support his determination of acceptability."
Accordingly, Dr. Breyer stated: "I agree to participate in the re-review process." Ms. Watt
responded that same day to commemorate the agreement, stating that she would "let the audit
team know that you have agreed to participate in the re-review process."

31.     The next day, Ankura sent a letter to Dr. Breyer enclosing a thumb drive
containing the x-ray images for 25 claimants, asking him to "review these images, using the
annotation tools to mark where you identify asbestosis and/or pleural plaques/calcifications, and
send us a summary of your review." The letter was signed by Ankura's Senior Director Bruna
Patterson, whose Ankura profile page touts her "over five years of experience" in fraud
prevention and detection, and describes the fact that she "manages the auditing program of 10
bankruptcy asbestos trusts," including through "present[ing] audit findings to the trusts'
executive directors, counsel, and other audit committee members," presumably including the
TAC members whose law firms compete with the firms that have retained Drs. Breyer and
Klepper.

32.     Dr. Breyer engaged in a good-faith effort to perform under the agreement between
he and Ankura. Ms. Patterson's letter was accompanied by a set of instructions by which Dr.
Breyer would supposedly be able to use a piece of software called the "Ramsoft DICOM
Viewer" to review and annotate the images. On August 26, Dr. Breyer participated in a
videoconference tutorial through which Ms. Patterson advised him as to how to use the software.

Complaint

The next day, he emailed Ms. Patterson to report that he had "become more comfortable with the system as I went along," but that he "would like to review my findings [i.e., the annotations he had done while unfamiliar with the software] and confirm them before sending the key back." He also requested advice as to "how to get a full size image," because "[i]t has been a problem working with just half the screen." The next day, in returning the drive, he explained:

> I attempted to complete the audit on the existing drive but have to conclude that the images were unsatisfactory for evaluation. This is because they only filled half the screen and were therefore reduced in size from normal. It is my usual practice to call reduced size images unreadable.

He concluded by stating that while he had "initially overlooked this problem hoping to get started," it "did not work out and I need to have full sized images to proceed."

33.     Ankura thereafter provided the images at issue on CDs.  As Dr. Breyer reported in an ensuing letter to Ms. Patterson on or around September 11, 2019:  "Using the CDs I was able to view the images using the NIOSH B-Viewer system including the recommended viewing software and high resolution screen."  He noted, however, that:

> [a]fter looking at some of the saved images I am concerned that they do not appear to be of the same quality of the images I viewed. The findings that are indicative of asbestosis have to be viewed under the NIOSH recommended guidelines to be properly evaluated. I am sure you are aware of this.

34.     Dr. Breyer nevertheless performed his side of the agreement by returning 24 of the samples with annotations on or about September 16, 2019.  Noting that one of the sample claimant's files still required review, Ankura sent that file on or about September 24, and after receiving further technical assistance from Ankura via videoconference on or about September 30, Dr. Breyer returned the annotated file to Ankura, thereby completing his performance under the parties' agreement.

35.     Dr. Breyer does not know whether Ankura thereafter performed its obligations under the agreement, but if it did so, it did so unreasonably, either by having unqualified "expert physicians" review his findings, or by failing to review them in good faith.  The next contact

from Ankura was on January 7, when Ms. Patterson emailed him to inquire as to his availability for a phone call the following day.  On that call Ms. Patterson stated that the trusts for whom Ankura performed the audit would no longer accept claims from claimants whose chest x-rays were read by Dr. Breyer.  Despite the pretext that "[t]he purpose would be to facilitate a conversation during which Dr. Breyer may attempt to support his determination of acceptability," there was no conversation.  Instead, his termination was summarily announced, by a mid-level administrator who has zero medical training, or any other qualifications that would have enabled her to participate in such a "conversation," even if she had wanted to.

36.     Shocked at the abruptness of Ms. Patterson's pronouncement, and the fact that Ankura gave no basis for its decision and refused to disclose how exactly the audit had been performed following his return of the annotated samples, Dr. Breyer emailed Ms. Patterson on January 9 asking that she "put me in contact with someone from the audit team who can give me additional information about the decision to no longer honor my x-ray reports."  The next day Ms. Patterson responded: "I shared your request with Trust counsel along with your contact information. Trust counsel will reach out to you directly."

37.     Hearing nothing after more than ten days, Dr. Breyer followed up:

> It probably won't surprise you to learn that nobody from your office has "reached out" to contact me. You have arbitrarily made a decision to disallow my reports after twenty nine years in which they met all standards.  Surely an explanation is forthcoming.  You owe it to me and certainly to my staff, several of whom are now facing homelessness from loss of livelihood.  It is not acceptable to cause havoc in peoples lives and then just run away without comment or explanation.

Through the date of filing, Ankura has continually refused to provide any information to Dr. Breyer as to the basis for his termination.  Indeed, it has refused to identify the so-called "expert physicians" who supposedly second-guessed his capabilities, how many such experts participated in the review, or even to disclose the qualifications of whoever it was who determined that his findings were unreliable.

13

**D. Dr. Klepper's Experience with Ankura's Sham "Audit"**

38.     Dr. Klepper's experience was virtually identical to Dr. Breyer's.  He was contacted by KMK on June 28, 2019 with an identical letter requesting his agreement to participate in the audit on behalf of "Participating Trusts," and agreed to do so on July 8, advising "Please send me the films and whatever software to illustrate my findings."  The same attorney with whom Dr. Breyer corresponded (Darcy Watt) replied two days later:  "Per your email below, I will notify the audit team that you have consented to participate in the Trusts' re-review process."

39.     Over the next week, Dr. Klepper diligently performed his obligations under the agreement, advising by reply email on July 17:  "Ms Watt, I got the images and instructions I reviewed the films, made arrows and circles and entered explanations where instructed."  In that message, he further advised Ms. Watt of the obstacles he faced in performing the review on the unfamiliar Ramsoft software:

> In saving the images I don't have the "Adobe PDF " as an option. I see Microsoft PDF  I did all but 1 or 2 as they would not save at all.  I am unable to see my results or review my text entered for each film.  I don't have clerical people working for me nor am I a computer savvy person. I spent several evenings working on this and feel that the films provided for me with exception of 2 or 3 are clearly positive and I have illustrated and explained my process however I am not even sure my work is saved and if it is I am unable to review it prior to returning it to you.

40.     Dr. Klepper further expressed some doubts about the reliability of Ankura's process, noting:

> Whoever is advising you  regardless of their academic credentials can't comment on the ILO system of scoring unless they are a B-reader themselves using the standard films for comparison side by side.  That would be like sending the films to a radiologist  without any instruction.  You would get 80% or your films read as "no acute intrathoracic abnormalities".   I am going to return what I have done.

41.     He further explained that "I have been doing this work in good faith with constant mindfulness of accuracy and honesty," while cautioning Ankura that "I am not comfortable with this process of being tested using a viewing/illustrating system that is foreign to me," and where it was not even clear whether his annotations had been properly saved.

14

42.     Ms. Watt responded: "I have forwarded your message to the audit team at Ankura. A team member will reach out to you with a response." No one from the "audit team" came forward with a satisfactory response.

43.     Over the ensuing months, Dr. Klepper repeatedly inquired as to the status of the "audit team's" review of his submissions, getting nothing but repeated assurances that his concerns would be addressed, and that "Trust counsel will contact you directly regarding the review findings." Ultimately, just like Dr. Breyer, the next communication Dr. Klepper received was a phone call from Ankura's Bruna Patterson, informing him that his medical reports would no longer be accepted by the Participating Trusts. And just like Dr. Breyer, there was no "conversation" as to the process by which the "audit" had been performed. Instead, it remained a complete black box: Neither KMK nor Ankura ever provided him with any written findings or decision, never told him who had second-guessed his work (or what their credentials were to do so), never told him which (if any) of the 25 re-reads the "audit" had disagreed with, or provided any other information about the process whatsoever.

**E.  The Sham Nature of Ankura's "Audit" and Its Consequences**

44.     Beyond all of the foregoing, the sham nature of the audit that Ankura developed and performed in collaboration with the "Participating Trusts" is further seen in the fact that Ankura did not select the 25-file "samples" it sent to Drs. Breyer and Klepper at random. Almost all of the claimants in the samples exhibited a "profusion" score of 1/0. As explained above, that reading means that Dr. Breyer or Dr. Klepper determined the profusion to be at a "1" level, with the possibility that it could alternatively be read at the "0" level. To the extent that Ankura and the Participating Trusts actually used one or more NIOSH-qualified B-Readers to evaluate the plaintiff-doctors' findings, the audit was inherently designed to consider the most borderline of asbestosis cases.

45.     The fact of reader variability is recognized in dozens of publications from NIOSH and the CDC, and in dozens of scholarly articles like *Variability In The Classification Of Radiographs Using The 1980 International Labor Organization Classification For*

15

*Pneumoconioses*, 114(4) *Chest* 1740-48 (1998); and *Inter-Reader Variability In Chest Radiography And Hrct For The Early Detection Of Asbestos-Related Lung And Pleural Abnormalities In A Cohort Of 636 Asbestos-Exposed Subjects*, 83(1) Int. Arch. Occup. Environ. Health 39-46 (2010).  The fact of inter-reader variability is recognized in plain terms in a comprehensive 2009 NIOSH report concerning the B-Reader Certification Program:  "[I]n spite of standardized classification methods and efforts in training and certification, considerable variability remains among physicians interpreting chest images for pneumoconiosis."  That report further recognizes:  "The causes of reader variability are many, and include film quality, reader training and experience, and bias, as well as the variability inherent in the act of individuals interpreting chest radiographs."  That report continues with a crucially important finding:

> The inherent qualities of chest radiography and the ILO Classification, and the human element of interpretation make variation in reading inevitable (32). The extensive literature detailing inter-reader variability indicates that not all the disagreement can be from bias related to the implications of a positive or negative reading. The great variation of normal in chest radiographs, the asymmetric distribution of small opacities within lung zones, and the contribution of non-pneumoconiotic factors lead to variation in interpretation. Numerous studies have been published in which experienced readers with no financial incentives have significant disagreements.

*See* Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, *The NIOSH B-Reader Certification Program:  Looking Into the Future* at 19 (2009).

46.     Ankura and the Participating Trusts' disqualification of Drs. Breyer and Klepper concerning their 1/0 reads was therefore based on nothing but recognition of the inherent fact that some doctors may rate a given x-ray one way, while others may rate it differently.  On information and belief, the "expert physicians" who Ankura claims evaluated Dr. Breyer's and Dr. Klepper's findings are biased in favor of negatively diagnosing the presence of asbestos-related disease, and significantly less qualified and less experienced than either Dr. Breyer or Dr. Klepper, and thus to the extent there is disagreement between them, the only reasonable

conclusion that Ankura and the Participating Trusts could have reached from the audits was that its own "expert physicians" were likely incorrect.

47.     Moreover, it has long been the standard custom and practice (as also recommended by NIOSH) that where two qualified B-Readers disagree as to a diagnosis or the extent of the injury, that a third independent qualified B-Reader will review the same images, to break the tie.  On information and belief, Ankura and the Participating Trusts did not employ that industry standard approach, but instead chose to rely on their own stable of lesser-experienced "expert physicians" who are prone to negative diagnoses of asbestos-related disease, and whom the Trusts compensated with victim funds with the sole bad faith intention and purpose of concluding that Drs. Breyer and Klepper had "failed" the audit.

48.     Furthermore, on information and belief, some or all of the samples on which Ankura sought re-review were not even the original films that Drs. Breyer and Klepper had read. For example, based on the age of some of the reads, Dr. Klepper is confident that his reads would have initially been performed on physical x-ray film, while all of the re-read samples he performed were digitized, which in certain circumstances can significantly impact the readability of a film.  To the extent that Ankura's team of supposed "expert physicians" were second-guessing Drs. Breyer and Klepper's evaluations by reviewing copies of copies, which may have passed through an unknown number of physical and software conversions in between, no reasonable radiologist could have confidence in their quality.

49.     Ankura performed a similar sham audit on at least two other B-Readers that Dr. Breyer and Dr. Klepper are aware of:  Dr. William "Rusty" Durham of Hattiesburg, Mississippi, and Dr. Henry Smith of Camp Hill, Pennsylvania.  Both Dr. Durham and Dr. Smith were subjected to an identical audit process as described herein, and both were deemed to have failed. Dr. Klepper and Dr. Breyer are unaware of any doctor who went through the process and was deemed to have "passed."  In short, Ankura and the Participating Trusts designed an audit

Complaint

process in which every participant failed, including four readers who each have decades worth of experience in performing B-reads, and who have each been certified by NIOSH multiple times.

50.     Significant consequences followed from Defendant Ankura's unreasonable, harmful, and defamatory conduct.  Perhaps most significantly from a human health perspective, during the pendency of the audit process Ankura and the Participating Trusts placed on hold hundreds or *thousands* of claims that had been supported by Dr. Breyer's and Dr. Klepper's reports.  The doctors have been notified by the law firms that retained them that many (or possibly all) such claims would be denied based on Ankura's and the Participating Trusts' determination.

51.     Even if those impacted claimants secure reads from other qualified physicians or take their claims to firms that engage other B-Readers, the compensation to which those claimants are presently entitled will necessarily be delayed by months, if not years, on account of Ankura's and the Trusts' actions – if those thousands of claimants ever receive the compensation to which they are entitled.

52.     From Dr. Breyer's and Dr. Klepper's perspective, the most significant consequence of Ankura's and the Participating Trusts' sham audits and findings is that they have been defamed by the dissemination of those findings, and those findings have essentially resulted in the termination of the doctors' expert witness practices in this area, causing them hundreds of thousands of dollars each in damages to date, with the prospect of additional millions of dollars in future lost profits damages.

53.     A third consequence of Ankura's and the Participating Trusts' sham audits and findings is what (on information and belief) motivated the conception and implementation of the entire sham process.  Drs. Breyer and Klepper primarily or exclusively devoted their B-reading legal practices to supporting the claims of claimants represented by law firms whose principals are not members of the trusts' Trust Advisory Committees, and for types of injuries that the TAC members' firms do not generally pursue.  By orchestrating a purge of claims submitted by TAC

18

members' competitors, Ankura and the Participating Trusts have protected the pots of money that reside in the Trusts for distribution to the firms run by the TAC members.

54.     The network of B-Readers who work on asbestos injury claims is small, and most participants are known to Drs. Breyer and Klepper.  As noted above, Drs. Breyer and Klepper are aware of two other B-Readers who largely perform their services in the same niche that the plaintiff-doctors do, and who were similarly terminated in the same time frame, through the same sham process.  Drs. Breyer and Klepper are unaware of any B-Reader who is frequently used by the firms run by the TAC members who was even subjected to the same sham audit process, let alone terminated according to it, and on that basis allege that Ankura and the Participating Trusts targeted only the "out-group" of doctors and law firms, to protect the practices of the "in-group" TAC members and the doctors they engage.

## FIRST CAUSE OF ACTION
### Intentional Interference with Contractual Relations

55.     Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

56.     Drs. Breyer and Klepper were parties to contracts with the law firms that engaged them to perform B-reads of the chest x-rays of the actual and potential clients of those law firms.

57.     Through its long experience in providing consulting services to the asbestos trusts, Ankura knew of the existence of such contracts, given that Dr. Breyer's and Dr. Klepper's B-reads were submitted in conjunction with claims filed by those law firms.  Most obviously, Ankura knew of Dr. Breyer's contract with Ketterman, Rowland & Westlund, given that its counsel KMK initially contacted that firm to initiate the audit.  Similarly, Ankura knew of Dr. Klepper's contract with Sammons & Berry, given that its counsel KMK initially contacted that firm to initiate the audit.

58.     Ankura's conduct in designing and perpetuating the audits prevented performance of those contracts by refusing to accept injury claims from claimants whose B-reads were performed by Drs. Breyer and Klepper.

59.     Ankura intended to disrupt the performance of those contracts, and knew that such disruption was certain or substantially certain to occur.

60.     Dr. Breyer and Dr. Klepper were harmed by Ankura's conduct, and Ankura's particular participation was a substantial factor in causing that harm.

61.     Drs. Breyer and Klepper have suffered present and future monetary injuries resulting from Ankura's and the Participating Trusts' conspiracy to interfere with those contracts.

**SECOND CAUSE OF ACTION**
**Intentional Interference with Prospective Economic Relations**

62.     Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

63.     Over the period shortly before and throughout the period in which the "audit" was conducted, Dr. Breyer was in an economic relationship with numerous law firms, including Ketterman Rowland & Westlund; Justinian Lane; Saklarios Blackwell & Schock; Peter T. Nicholl, and the Runkle Law Firm whereby he would review radiographic images of the firms' actual and prospective clients.  Dr. Breyer was compensated for rendering his medical diagnosis at a fixed rate per client, regardless of whether the diagnosis was positive or negative.  Those relationships certainly would have continued indefinitely but for the conduct alleged herein, and based on his past experience Dr. Breyer would have been engaged by additional firms as well.

64.     Over the period shortly before and throughout the period in which the "audit" was conducted, Dr. Klepper was in an economic relationship with numerous law firms, including Bullock Campbell Bullock & Harris, PC; Cory Watson PC; Law Offices of Ezequiel Reyna, Jr.; Ferrell Law Group, Flint Law Firm, Law Offices of Patrick M. Walsh, LLC, Sach Law, LLC; and The Cheek Law Firm, whereby he would review radiographic images of the firms' actual and prospective clients.  Like Dr. Breyer, Dr. Klepper was compensated for rendering his medical diagnosis at a fixed rate per client, regardless of whether the diagnosis was positive or negative.  Those relationships certainly would have continued indefinitely but for the conduct

alleged herein, and based on his past experience Dr. Klepper would have been engaged by additional firms as well.

65.     Ankura knew that Dr. Breyer and Dr. Klepper were performing this work for these specific firms.  Indeed, Ankura first raised the prospect of performing these audits through having its counsel at KMK contact five of these firms (in Dr. Breyer's case), and one of the firms with whom Dr. Klepper was engaged to perform B-reads.  Ankura further knew that that work was ongoing and expected to continue into the future.

66.     Ankura nevertheless engaged in the sham audit process described herein, with the intent not to ensure the accuracy or reliability of Dr. Breyer and Dr. Klepper's B-reads, but to ensure that they would be deemed to "fail" the audit, and thereby be precluded from supporting the claims of additional claimants.  Ankura knew that its conduct would disrupt Dr. Breyer and Dr. Klepper's economic relationship with the law firms that engaged them, and specifically intended that result.

67.     Beyond the wrongfulness of the performance of the sham audit, Ankura's conduct was further wrongful insofar as it constituted defamation per quod, and violated the covenant of good faith and fair dealing, as alleged *infra*.  It was also wrongful in that it caused the denial of the existing claims of claimants whose claims to the Participating Trusts were supported by B-reads of Drs. Breyer and Klepper, thereby delaying (in the best case), or entirely denying (in the worst) compensation to claimants who were in fact entitled to compensation.

68.     Dr. Breyer and Dr. Klepper were economically harmed by this conduct, in amounts to be proven at trial, but at least in the amount of hundreds of thousands of dollars per year in past and future damages.  Ankura's conduct was a substantial (indeed, the only) factor in causing that harm.

## THIRD CAUSE OF ACTION
### Negligent Interference with Prospective Economic Relations

69.     Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

70.     Over the period shortly before and throughout the period in which the "audit" was conducted, Dr. Breyer was in an economic relationship with numerous law firms, including Ketterman Rowland & Westlund; Justinian Lane; Saklarios Blackwell & Schock; Peter T. Nicholl, and the Runkle Law Firm whereby he would review radiographic images of the firms' actual and prospective clients.  Dr. Breyer was compensated for rendering his medical diagnosis at a fixed rate per client, regardless of whether the diagnosis was positive or negative.  Those relationships certainly would have continued indefinitely but for the conduct alleged herein, and based on his past experience Dr. Breyer would have been engaged by additional firms as well.

71.     Over the period shortly before and throughout the period in which the "audit" was conducted, Dr. Klepper was in an economic relationship with numerous law firms, including Bullock Campbell Bullock & Harris, PC; Cory Watson PC; Law Offices of Ezequiel Reyna, Jr.; Ferrell Law Group, Flint Law Firm, Law Offices of Patrick M. Walsh, LLC, Sach Law, LLC; and The Cheek Law Firm, whereby he would review radiographic images of the firms' actual and prospective clients.  Like Dr. Breyer, Dr. Klepper was compensated for rendering his medical diagnosis at a fixed rate per client, regardless of whether the diagnosis was positive or negative.  Those relationships certainly would have continued indefinitely but for the conduct alleged herein, and based on his past experience Dr. Klepper would have been engaged by additional firms as well.

72.     Ankura knew that Dr. Breyer and Dr. Klepper were performing this work for these specific firms.  Indeed, Ankura first raised the prospect of performing these audits through having its counsel at KMK contact five of these firms (in Dr. Breyer's case), and one of the firms with whom Dr. Klepper was engaged to perform B-reads.  Ankura further knew that that work was ongoing and expected to continue into the future.

73.     Ankura nevertheless engaged in the sham audit process described herein, knowing that if it failed to act with reasonable care, Dr. Breyer and Dr. Klepper would be precluded from performing B-reads to support the claims of additional claimants.  Ankura knew or should have

known that conducting an "audit" in this manner would disrupt Dr. Breyer and Dr. Klepper's economic relationship with the law firms that engaged them.

74. Ankura failed to act with reasonable care, and engaged in wrongful conduct as described herein, including by (1) selecting a non-representative sample of marginal diagnoses, while knowing of the fact of reader variability; (2) providing Dr. Breyer and Dr. Klepper with software that it knew they were unfamiliar with in asking them to re-review the claimants' x-rays; (3) tasking biased and less experienced "expert physicians" with second-guessing Dr. Breyer and Dr. Klepper's diagnoses; and (4) on information and belief encouraging or otherwise suggesting to the "expert physicians" that the purpose of the audit was to deem Dr. Breyer and Dr. Klepper's B-reads unreliable and thereby "fail" them.  Ankura's failure to exercise reasonable care in designing and conducting this audit is made manifest by the fact that all four doctors known to have participated were deemed by Ankura to have "failed."

75. Dr. Breyer and Dr. Klepper were economically harmed by this conduct, in amounts to be proven at trial, but at least in the amount of hundreds of thousands of dollars per year in past and future damages.  Ankura's conduct was a substantial (indeed, the only) factor in causing that harm.

## FOURTH CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing

76. Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

77. In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another.

78. Dr. Breyer and Dr. Klepper entered into a contract with Ankura whereby they accepted Ankura's offer that they participate in an "audit" to maintain their eligibility to continue to submit B-reads in support of claimants' claims to the trusts.  In consideration of that

23

agreement, Dr. Breyer and Dr. Klepper each spent multiple hours over the course of several days performing the obligations that they accepted.  In so doing, Dr. Breyer and Dr. Klepper both did all, or substantially all of the significant things that their agreements with Ankura required them to do.

79.     In performing its obligations under the contract (i.e., providing Dr. Breyer and Dr. Klepper with a sample of their prior B-reads to re-review, and in evaluating the materials that Dr. Breyer and Dr. Klepper had returned to Ankura to decide whether their B-reads would continue to be accepted by the Participating Trusts), Ankura did not act fairly or in good faith as described herein, including by (1) selecting a non-representative sample of marginal diagnoses, while knowing of the fact of reader variability; (2) providing Dr. Breyer and Dr. Klepper with software that it knew they were unfamiliar with in asking them to re-review the claimants' x-rays; (3) tasking biased and less experienced "expert physicians" with second-guessing Dr. Breyer and Dr. Klepper's diagnoses; and (4) on information and belief encouraging or otherwise suggesting to the "expert physicians" that the purpose of the audit was to deem Dr. Breyer and Dr. Klepper's B-reads unreliable and thereby "fail" them.  Far from a mere failure of "good faith," this conduct was engaged in in decidedly bad faith.

80.     Dr. Breyer and Dr. Klepper were economically harmed by this conduct and in being deemed to have "failed" the audit, in amounts to be proven at trial, but at least in the amount of hundreds of thousands of dollars per year in past and future damages.  Ankura's conduct was a substantial (indeed, the only) factor in causing that harm.

## FIFTH CAUSE OF ACTION
### Defamation Per Quod

81.     Plaintiffs hereby reincorporate and re-allege all the preceding paragraphs as if fully set forth herein.

82.     As the end result of the sham audit process described herein, Ankura made multiple statements to attorneys and law firms around the country stating that it and the Participating Trusts had conducted an audit of Drs. Breyer and Klepper, and that the

Participating Trusts would no longer accept their B-reads in support of claimant's claims.  The necessary implication of those statements was that Drs. Breyer and Klepper were unqualified to perform reliable B-reads, that Drs. Breyer and Klepper were not "credible," and/or that they had engaged in wrongdoing in the performance of their professional work.

83.     While Ankura's statements that the Participating Trusts would no longer accept B-reads performed by Dr. Breyer and Dr. Klepper was strictly true, that facts and circumstances known to the recipients of those statements injured Dr. Breyer and Dr. Klepper in their occupations, exposed them to shame, and discouraged those recipients from associating and dealing with Drs. Breyer and Klepper.  Specifically, the letters that KMK had sent to the plaintiff-side firms on behalf of Ankura and the Trusts specifically indicated that the audits of Dr. Breyer and Dr. Klepper were being performed under the Trusts' standardized "Trust Distribution Procedures" regarding the "Credibility of Medical Evidence."  Under those procedures, the Trusts reserve the right to audit the "reliability" of medical evidence submitted by doctors, and reserve the right to "decline to accept additional evidence from such provider" where the Trust "reasonably determines that any [such individual] has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust."

84.     By thus impugning the professional integrity and/or competence of Dr. Breyer and Dr. Klepper's work, Ankura has injured Dr. Breyer and Dr. Klepper not only with respect to work that they have performed and would in future perform on behalf of claimants to the Participating Trusts.  Rather, this defamation has had widespread effects, including through other asbestos trusts either putting on "hold" claims supported by Dr. Breyer and Dr. Klepper's B-reads, or declining such B-reads from Dr. Breyer and Dr. Klepper entirely.  The defamation has caused Dr. Breyer and Dr. Klepper's work in this area to "dry up," because asbestos law firms around the country are now unwilling to retain them based on Ankura's false determination that their B-reads are not "reliable," and/or that they have "engaged in a pattern or practice of providing unreliable medical evidence."

85.     As alleged herein, Ankura failed to use reasonable care in the course of making its audit determinations and disseminating its defamatory conclusions.

86.     Beyond their direct financial losses, Drs. Breyer and Klepper have suffered harm to their reputations, as well as shame and mortification at Ankura's publicized determination that their B-reads are not "reliable," and/or that they have "engaged in a pattern or practice of providing unreliable medical evidence."  Ankura either knew that its determinations and ensuing defamations were false, or had serious doubts as to the truth of those statements, and acted with malice, oppression, and/or fraud in the course of making those determinations and disseminating the conclusions.

### **PRAYER**

**WHEREFORE**, Drs. Breyer and Klepper pray for judgment against Ankura Consulting Group as follows:

1.     For compensatory damages;

2.     For punitive damages;

3.     For pre-judgment interest;

6.     For such other and further relief this Court deems just and proper.


Dated:  April 8, 2021                              GAW | POE LLP


By:      s/ *Mark Poe*
                                                   Mark Poe
                                                   Attorneys for Plaintiffs

1

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 3-6, Plaintiffs Donald Breyer, M.D., and Mark Klepper, M.D. hereby demand that this matter be tried to a jury.


Dated:  April 8, 2021                                                   GAW | POE LLP


                                                         By:        s/ *Mark Poe*
                                                                    Mark Poe
                                                                    Attorneys for Plaintiffs

Complaint